Rel: July 10, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2026

_____

## CL-2025-0848

_____

## C.M.

## v.

## Mobile County Department of Human Resources

## Appeal from Mobile Juvenile Court
## (JU-15-934.05)

MOORE, Presiding Judge.

C.M. ("the mother") appeals from a judgment entered by the Mobile Juvenile Court ("the juvenile court") that terminated her parental rights to P.M. ("the child").  Because the juvenile court did not receive sufficient evidence demonstrating that the child likely would be adopted once the mother's parental rights were terminated, we reverse the judgment.

Background

The child was born in 2014 and, at the time of his birth, was addicted to opiates. The child has no legal father. Shortly after the child was born, the Mobile County Department of Human Resources ("DHR") placed the child with his maternal grandmother, who had adopted the mother's two older children. When the child was five months old, the mother had sufficiently rehabilitated herself to regain custody of the child; however, in 2015, the Baldwin County Department of Human Resources picked up the child again when the mother became intoxicated and solicited strangers to take care of the child. The child was later adjudicated to be a dependent child, and, on August 3, 2016, the juvenile court awarded legal and physical custody of the child to his maternal grandmother.

Two months after the custody award, without DHR's knowledge or a court order modifying the custody of the child, the maternal grandmother returned the child to the mother. The mother cared for the child for the next seven years, during which he was diagnosed with attention-deficit/hyperactivity disorder ("ADHD") and developed behavioral problems. In March 2023, DHR received a report that the

2

child had attended five different schools in the Mobile County school system and that the mother had been banned from school property because of her erratic and disruptive behavior. DHR filed an emergency custody petition, regained custody of the child, and obtained an order suspending visitation between the mother and the child until the mother could undergo a psychological evaluation.

In June 2023, a psychiatrist diagnosed the mother with a history of substance abuse and drug addiction, psychosis, paranoia, and suspected antisocial personality disorder. The mother declined treatment. The mother resumed supervised visitation with the child, but, in March 2024, the mother tested positive for methamphetamine. On April 11, 2024, DHR held an individualized-service-plan ("ISP") meeting, during which the mother denied that she needed any services; she agreed only to submit to random drug screens and to supervised visits. At that point, DHR established a primary permanency plan for the child to be placed with a relative and a concurrent plan of adoption with no identified adoptive resource.

In September 2024, the mother was convicted of felony theft, and she was placed on probation. Shortly thereafter, the mother appeared at

3

the DHR office with firearms. When the police were notified, the mother fled the scene, and she was arrested. Following that incident, on September 11, 2024, DHR banned the mother from its premises, and it conducted another ISP meeting during which the primary permanency plan for the child was changed to adoption with no identified adoptive resource. As part of that plan, DHR agreed "to submit the paperwork to find an adoptive resource for [the child]" and "to look for placement for [the child] that will meet his behavioral needs."

On September 20, 2024, DHR filed a petition to terminate the mother's parental rights. On September 30, 2024, the mother's probation was revoked, and she was incarcerated in the Julia Tutwiler Prison for Women. On December 18, 2024, the juvenile court entered an order establishing adoption with no identified adoptive resource as the permanency plan for the child. The juvenile court scheduled the termination-of-parental-rights trial for June 26, 2025, but, on that date, DHR moved the juvenile court to continue the trial so that it could continue to explore adoptive resources for the child. The mother was released from prison on July 2, 2025, and the juvenile court rescheduled the trial for August 14, 2025.

On August 18, 2025, the juvenile court entered a final judgment terminating the mother's parental rights. In the judgment, the juvenile court found, among other things, that there were grounds for termination, that there was no relative available to assume custody of the child, that leaving the child in foster care was untenable because of the mother's disruptive behavior, that it was in the best interests of the child to terminate the mother's parental rights, and that DHR had made reasonable efforts to finalize the permanency plan for the child. The judgment also provided, in pertinent part:

> "[A]lthough the child does not have an adoptive resource currently[,] the Court finds that he is adoptable. The child is only eleven years old. Although he disrupted several foster care placements in the past, he has been in residential treatment for behavior issues for almost a year. Once the child is eligible for adoption, the State DHR office, in coordination with the county office, can start recruitment efforts that are not available before termination of parental rights. Those efforts include placement of the child on various websites and private agencies devoted to finding families for foster children. According to the social worker, the State office has facilitated seventy-three adoptions through these efforts so far this year."

The juvenile court awarded permanent legal custody of the child to DHR "for permanent placement for adoption."

On August 25, 2025, the mother filed a postjudgment motion in which she argued, among other things, that DHR had failed to prove by clear and convincing evidence that it had made sufficient efforts to identify an adoptive resource for the child and that DHR had failed to present specific evidence regarding the likelihood that the child would be adopted considering his special needs. The juvenile court denied the postjudgment motion. The mother timely appealed. This court heard oral argument regarding the appeal on May 12, 2026.

## Issues

The mother argues on appeal that the juvenile court lacked sufficient evidence of grounds for termination, that the juvenile court erred in failing to maintain the status quo as a viable alternative to termination, and that the juvenile court erred in finding that it was in the best interests of the child to terminate the mother's parental rights "where DHR relied on an adoption plan that was uncertain and not child-specific, with no identified adoptive resource, no home study underway, and no evidence that adoption was a realistic permanency outcome for this older child with special needs." The mother's brief, p. 4. We find the last issue dispositive of this appeal.

Standard of Review

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved.'
>
> "KGS Steel[, Inc. v. McInish], 47 So. 3d [749] at 761 [(Ala. Civ. App. 2006)].
>
> "… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon

7

the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.' § 25-5-81(c)[, Ala. Code 1975]."

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

Analysis

Section 12-15-319(a), Ala. Code 1975, provides, in pertinent part: "In a hearing on a petition for termination of parental rights, the court shall consider the best interests of the child." Thus, in addition to finding grounds for termination and exhausting all viable alternatives, before terminating parental rights, a juvenile court must consider whether that remedy will serve the best interests of the child. "Even in cases in which grounds for termination exist and no other viable alternative may be implemented, a juvenile court still must make a separate determination

8

that termination of parental rights serves the best interests of the child, and, if it does not, it may not terminate parental rights." J.A. v. S.L., 406 So. 3d 129, 139 (Ala. Civ. App. 2024).

As this court explained in J.A.:

"'Whereas the first two elements exist to protect the parent's rights, this third element exists to protect the child's interests.' Ex parte Bodie, 377 So. 3d [1051] at 1068 [(Ala. 2022)] (Parker, C.J., concurring specially). The best-interests-of-the-child inquiry focuses exclusively on the impact of the termination on the needs and interests of the child. In considering the best interests of the child, a juvenile court is determining not whether it can terminate parental rights, but whether it should terminate parental rights for the benefit of the child for whom the remedy is intended. See S.D.P. v. U.R.S., 18 So. 3d 936, 942 (Ala. Civ. App. 2009) (Moore, J., concurring specially).

"In examining whether termination of parental rights promotes the best interests of the child, a juvenile court should consider all the traditional best-interests factors, see Ex parte Devine, 398 So. 2d 686, 696 (Ala. 1981) (holding that, in deciding what is in the best interests of the child, the fact-finder should consider, among other things, the emotional, social, moral, material, and educational needs of the child), but the court should primarily focus on the effect of the proposed termination on the child's needs for security, stability, and permanency. See S.D.P., 18 So. 3d at 944 (Moore, J., concurring specially). By allowing a juvenile court to involuntarily sever the rights of a parent so that the child can be adopted without the consent of that parent, termination of parental rights is a remedy that is specially designed to meet the particularized needs of a child for a stable and permanent custodial arrangement. See T.W. v. Calhoun Cnty. Dep't of Hum. Res., [391 So. 3d 306 (Ala. Civ.

9

App. 2023)]. Thus, at a minimum, when deciding whether termination of parental rights is in the best interests of a child, a juvenile court should focus on whether termination of the legal relationship between the child and the parent will protect the welfare of the child and promote the stability and permanency of the child. Id."

Id.

In this case, the juvenile court concluded in the final judgment "that termination of parental rights and adoption by foster parents is in the best interest of the child." The juvenile court implicitly determined that the termination of the mother's parental rights would serve the child's interests in achieving stability and permanency through adoption. However, the evidence showed that no foster parent had come forward to adopt the child, despite DHR's having implemented a permanency plan of adoption for the child as early as April 11, 2024. By the time of the trial on August 14, 2025, the sole permanency plan for the child had been adoption with no identified adoptive resource for almost one full year. During that year, the child had been residing in a group home, and DHR had not identified a foster parent who was willing to adopt the child or any other adoptive resource for him. In June 2025, DHR obtained a continuance of the trial to allow it to continue to explore adoptive resources for the child, but those efforts were obviously unsuccessful.

10

In her postjudgment motion, the mother argued, among other things, that DHR had failed to present clear and convincing evidence that the child would likely be adopted. The mother pointed out that the DHR social worker who testified in the case had expressed his general opinion that the child was adoptable, but, she argued, he "failed to support his opinion with specific evidence concerning the child." On appeal, the mother reiterates her argument.

The mother first points out that the child is a special-needs child for adoption purposes. That point is not in legitimate dispute. Rule 660-5-22-.06(2)(a)2.(ii), Ala. Admin. Code (Dep't of Hum. Res.), defines a special-needs child to include a child who "has a known emotional disturbance/ behavioral issue that requires on-going treatment and that has been documented by a mental health professional." Rule 660-5-22-.06(2)(a)2.(v) also classifies a child over the age of five years old as being a special-needs child. The undisputed evidence in this case shows that the child is 11 years old and that he has been diagnosed with emotional disturbance/behavioral issues for which he is receiving ongoing treatment, as documented by a mental-health professional. The DHR social worker confirmed that the child had again been diagnosed with

11

mental-health and behavioral problems in 2023 and that he was currently addressing those problems through medication and therapy that was overseen by a qualified therapist in the group home where he now resides.

For the purposes of the Alabama Minor Adoption Code, Ala. Code 1975, § 26-10E-1 et seq., "[a]ny minor who is available for adoption may be adopted ...." Ala. Code 1975, § 26-10E-6. A judgment terminating parental rights makes a child available for adoption without the consent of his or her parents. See Comment to § 26-10E-6. Under Alabama law, a child with special needs is "adoptable" even if the child has serious mental-health and behavioral problems. However, as r. 660-5-22-.06(2)(a)2., a DHR regulation, recognizes, a child with special needs requires "more than ordinary parental duties from the adoptive parents; that children with special needs usually incur extra expenses; and that parenting children with special needs is more challenging tha[n] parenting children without special needs." Accordingly, Alabama law acknowledges that a child with special needs is less likely to be adopted than a child without special needs.

12

Recognizing that fact, in <u>T.W. v. Calhoun County Department of Human Resources</u>, 391 So. 3d 306 (Ala. Civ. App. 2023), this court held that,

> "before proceeding to terminate the parental rights of the parents of special-needs children, a juvenile court must consider whether the children will likely achieve permanency through adoption. ... In order for the juvenile court to consider that factor, it was incumbent upon DHR to present clear and convincing evidence of the viability of adoption so that the juvenile court could make an informed evaluation and decision."

<u>Id.</u> The mother argues that DHR did not present sufficient evidence of the viability of adoption for the child for the juvenile court to determine that termination of her parental rights would be in his best interests.

The DHR social worker testified that, when DHR implements a permanency plan of adoption with no identified adoptive resource, the county agency typically fills out a packet of information and submits it to the state office overseeing adoptions. Together, the county and the state officials assigned to the case then search for a foster parent to adopt the child. The DHR social worker did not testify as to whether that happened in this case. The DHR social worker then testified that, after DHR obtains a judgment terminating parental rights, DHR can submit the child's information to various adoption websites and private adoption

agencies that otherwise would not solicit potential adoptive parents for the child. The DHR social worker testified that he had personally overseen approximately 20 cases in which a child was adopted after termination of parental rights when the permanency plan was adoption with no identified adoptive resource. Of those cases, he said, approximately 80% of those children qualified as special-needs children. However, the DHR social worker did not testify as to the nature of those children's special needs. According to the DHR social worker, in the fiscal year 2025, 73 children across the state had been adopted with the same permanency plan following the termination of parental rights. The DHR social worker opined that the child was adoptable and that it would be in the best interests of the child to be freed for adoption.

On cross-examination, the DHR social worker was asked why it would be in the best interests of the child to terminate the mother's parental rights when no adoptive resource was waiting to adopt the child. The DHR social worker repeated that the child was adoptable and explained that the fact that no one had come forward at that point as a potential adoptive resource did not mean that the child would not be adopted. The DHR social worker also testified that the child would

14

benefit from the termination of the mother's parental rights because the judgment would allow DHR to pursue avenues for recruitment of an adoptive resource that were dependent upon the child's being available for adoption without legal risk. The DHR social worker did not know the success rate of the websites and private agencies that DHR could utilize after termination of parental rights, but he considered them successful. The DHR social worker predicted that, <u>if a proper home could be found for the child</u>, the child could be adopted within a year, although, he said, it sometimes took two or three years.

The mother correctly notes that the record contains no evidence indicating that an adoptive resource had been identified for the child, that no adoptive home study was underway, <u>see</u> Ala. Code 1975, § 26-10E-19 and § 26-10E-19.1 (requiring home studies for prospective adoptive parents of minor children), and that no one had been introduced to the child as a prospective adoptive resource. Those circumstances do not necessarily require reversal of the judgment. Our legislature has authorized juvenile courts to terminate parental rights for children whose permanency plan is adoption with no identified adoptive resource. <u>See</u> Ala. Code 1975, § 12-15-315(a)(2). The fact that DHR has been

unable to identify an adoptive resource and that an adoptive resource is not waiting to adopt the child does not mean that a juvenile court cannot terminate the mother's parental rights. See R.B. v. State Dep't of Hum. Res., 669 So. 2d 187, 191 (Ala. Civ. App. 1995). However, those circumstances are highly relevant to whether it is in the best interests of the child to terminate parental rights. Id. It would not be in the best interests of the child to terminate the mother's parental rights for the purpose of facilitating an adoption that will not occur, leaving the child to languish in long-term foster care with no real opportunity for achieving permanency.

When DHR adopted the permanency plan of adoption with no identified adoptive resource in April 2024, it was required to use reasonable efforts to execute that plan. See § 12-15-315(c). DHR placed the child in several foster homes, but none of his foster parents came forward to adopt the child, and the child was ultimately placed in a group home because he had disrupted his foster-home placements with his unruly behavior. The record contains no other evidence regarding the efforts DHR undertook to recruit an adoptive resource for the child, but, whatever they were, those efforts failed. Even after DHR obtained a

delay of the trial to continue its recruitment efforts, DHR did not present any evidence indicating that it had located anyone who could prospectively adopt the child. When considering the serious mental-health issues and behavioral problems of the child, that evidence strongly suggested that the child was not readily adoptable. The DHR social worker nevertheless testified that the child was adoptable.

In <u>In re Brian P.</u>, 99 Cal. App. 4th 616, 624, 121 Cal. Rptr. 2d 326, 332 (2002), the California Court of Appeal for the First District, applying California law that requires clear and convincing evidence of the likelihood that adoption will take place within a reasonable time, <u>see</u> <u>In re Amelia S.</u> 229 Cal. App. 3d 1060, 280 Cal. Rptr. 503 (1991), held that, when assessing the likelihood of adoption, a juvenile court may not premise a finding that a child is likely to be adopted on an opinion of the county Social Services Agency that the child is adoptable and that his or her prospects for adoption are "very good." The court explained that "[t]he issue of adoptability requires the court to focus on the child, and whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt." 99 Cal. App. 4th at 624, 121 Cal. Rptr. 2d at 332.

In this case, DHR's social worker acknowledged that DHR would have to disclose to prospective adoptive parents that the child suffered from severe behavioral problems that had led to multiple disruptions of foster homes. To prove that the child likely would be adopted, the social worker testified that DHR had, in the past, successfully recruited adoptive families for other children with unspecified special needs and with the same permanency plan following termination of parental rights. However, the DHR social worker did not inform the juvenile court of the number of children with special needs who had not been adopted. The juvenile court heard that 73 children were adopted in 2025, but it did not receive any evidence of the overall number of children in DHR's custody who were awaiting adoption. The evidence does not demonstrate whether DHR had secured adoptions for 73 out of 100 children or for 73 out of 1,000 children, and the evidence did not show that an available pool of prospective adoptive parents exists for a child like the child in this case. Without that information, the juvenile court could not determine that the child would probably be adopted. Cf. Bradley v. Arkansas Dep't of Hum. Servs., 732 S.W.3d 56, 64 (Ark. Ct. App. 2026) ("Regarding adoptability, the Department's adoption specialist testified that she ran

a data match with MC's characteristics, that there were 333 potential adoptive resources and that MC was likely to be adopted.").

DHR did present evidence of the broader range of services that it could access to assist it in recruiting an adoptive resource for a child after a termination of parental rights, cf. D.M. v. Dale Cnty. Dep't of Hum. Res., 413 So. 3d 750, 755 (Ala. Civ. App. 2024) (noting a lack of evidence of the methodology used to recruit adoptive resources when reversing a judgment terminating parental rights), but the fact that a child is eligible for more social services designed to facilitate adoption does not bear on the pivotal question of whether the child is likely to be adopted. See In re Brian P. 99 Cal. App. 4th at 624, 121 Cal. Rptr. at 332 ("The June 20 'assessment' merely concluded that Brian was 'approved for adoptive services because of lack of parental compliance with the case plan.' This says nothing about his adoptability.").

As DHR's attorney admitted in his closing argument when commenting on the state of the evidence: "Maybe [the child] would be adopted in a year, maybe he would never be adopted." However, Alabama law does not allow a juvenile court to gamble on the adoptive prospects of a child. Unlike in other states, see, e.g., Ark. Code Ann. § 9-35-337;

19

705 Ill. Comp. Stat. 405/2-34; N.Y. Fam. Ct. Act § 635; Okla. Stat. tit. 10A, § 1-4-909; Tex. Fam. Code Ann. § 161.302; Wash. Rev. Code § 13.34.215, in Alabama, once parental rights have been terminated to facilitate adoption, those rights cannot be restored when the contemplated adoption fails. See V.M. v. State Dep't of Hum. Res., 710 So. 2d 915, 921 (Ala. Civ. App. 1998) ("[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated."). Under Alabama law, if a child is not adopted following the termination of parental rights and an award of permanent legal custody to DHR, the child will likely remain orphaned and dependent upon the state until the child ages out of the system. That outcome does not serve the best interests of the child.

## Conclusion

In this case, the juvenile court determined that it would be in the best interests of the child to terminate the mother's parental rights to facilitate the adoption of the child. However, the record does not contain evidence from which the juvenile court could have been clearly convinced that the child would likely achieve permanency through adoption. For that reason, the judgment of the juvenile court is reversed. However,

20

nothing in our opinion should be construed as requiring the juvenile court to reunite the child with the mother or to leave the child in foster care indefinitely. The child remains dependent and within the custody of DHR with a permanency plan for adoption. DHR must continue to use reasonable efforts to execute that plan, and if, through its efforts or otherwise, it eventually appears the child will likely be adopted, it may again petition the juvenile court to terminate the mother's parental rights. Likewise, if the mother rehabilitates herself so that she can safely regain custody of the child, the juvenile court may consider returning the child to her care. We hold only that, on the state of this record, termination of the mother's parental rights was not proven to be in the best interests of the child. See T.W., 391 So. 3d at 318.

REVERSED AND REMANDED.

Hanson and Fridy, JJ., concur.

Edwards and Bowden, JJ., dissent, without opinions.